**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| STEVEN MARK LALIBERTE, | CASE NO. 5:22-CV-01856-CAB |
| Plaintiff, | JUDGE CHRISTOPHER A. BOYKO |
| v. | |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | MAGISTRATE JUDGE CARMEN E. HENDERSON |
| Defendant, | **REPORT & RECOMMNEDATION** |

**I. Introduction**

Plaintiff, Steven Mark Laliberte ("Laliberte" or "Claimant"), seeks judicial review of the final decision of the Commissioner of Social Security denying his application for a period of disability and disability insurance benefits ("DIB"). This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b). For the reasons set forth below, it is RECOMMENDED that the Court OVERRULE Claimant's Statement of Errors and AFFIRM the Commissioner's decision.

**II. Procedural History**

On April 2, 2020, Claimant filed an application for DIB, alleging a disability onset date of September 28, 2017. The application was denied initially and upon reconsideration, and Claimant requested a hearing before an administrative law judge ("ALJ"). On January 19, 2021 and November 9, 2021 the ALJ held a hearing, during which Claimant testified represented by counsel. Gene Burkhammer (at the initial hearing), and Brett Salkin (at the supplemental

hearing), both impartial vocational experts, also testified. On January 7, 2022, the ALJ issued a written decision finding Claimant was not disabled. (ECF No. 7, PageID #: 40). The ALJ's decision became final on August 18, 2022, when the Appeals Council declined further review. (ECF No. 7, PageID #: 29).

On October 14, 2022, Claimant filed his Complaint to challenge the Commissioner's final decision. (ECF No. 1.) The parties have completed briefing in this case. (ECF Nos. 9 and 10). Claimant asserts the following assignments of error:

> (1) The ALJ committed harmful error when she failed to properly apply the criteria of Social Security Ruling 16-3p and failed to find that the intensity, persistence and limiting effects of Laliberte's symptoms, including pain, precluded him from engaging in substantial gainful activity on a full-time and sustained basis.

> (2) The ALJ committed harmful error when at Steps Four and Five of the Sequential Evaluation when she found that Laliberte had transferable work skills which precluded a finding of disability.

(ECF No. 9 at 1).

## III. Background

### A. Relevant Hearing Testimony

During the initial hearing on January 19, 2021, Claimant testified to the following: Claimant is a 50-year-old male who lives with his wife and three children. (ECF No. 7, PageID #: 125-26). He has a driver's license and has had a handicap placard since July 2014. (*Id*. at PageID #: 126-127). Claimant graduated high school and completed a year of college. (*Id*. at PageID #: 127). Claimant discussed his past work. (*Id*. at PageID #: 127-32). He had a liver transplant in December 2014. (*Id*. at PageID #: 133-34). Following his liver transplant, Claimant returned to work in March of 2016 and stopped working in September of 2017. (*Id*. at PageID #: 134-35). Claimant complained of "losing" his thoughts. (*Id*. at PageID #: 135). Claimant

discussed his kidney failure and additional surgery to his liver, wrist (following a break), and hip replacements. (*Id.* at PageID #: 135-137). Claimant discussed his need to use a cane at night and when he left his house. (*Id.* at PageID #: 138). Claimant discussed issues with his knees, including a presently sore knee caused by avascular necrosis. (*Id.* at PageID #: 139). In January 2021, Claimant suffered a stroke and has no residual effects. (*Id.* at PageID #: 140). Claimant testified that he takes medication for his diabetes, which causes shakes, fleeting train of thought, and low energy. (*Id.* at PageID #: 141-42). Claimant testified that he uses a computer for about 30 minutes at a time, but that there is not a "time limit". (*Id.* at PageID #: 142). Claimant sits most of the day without trouble. (*Id.* at PageID #: 143). Claimant testified that he cannot work because of his memory issues. (*Id.* at PageID #: 144).

During the November 9, 2021, hearing, Claimant testified that he experienced several side effects from his medication including memory problems, frequent urination, and swollen feet. (*Id.* at PageID #: 78, 79, 80).

Based on testimony from the January 2021 hearing, the ALJ determined Claimant's past relevant work was that of a telecommunications sales representative. (*Id.* at PageID #: 74). During the November 9, 2021 hearing, a vocational expert testified regarding Claimant's transferrable skills and ability to perform other work. (*Id.* at PageID #: 84-92). The ALJ asked the vocational expert the following hypothetical:

> Q  Okay.  So, for my first hypothetical, this individual could stand and/or walk with normal breaks for a total of two hours in an eight-hour workday, sit with normal breaks for about six hours in an eight-hour workday -- sorry.  I realized I hadn't typed that. Let's see.  The individual could occasionally lift and/or carry, including upper pulling, 10 pounds, frequently lift, stand, or carry, including upper pulling, less than 10 pounds.  The individual could occasionally climb ramps and stairs, never climb ladders, ropes, and scaffolds.  The individual could occasionally balance, stoop, kneel, crouch, crawl.  The individual could frequently reach and

> operate hand controls with the right upper extremity.  I'm gonna limit foot controls bilaterally to occasionally.  I will add individual needs to ambulate with a cane. The individual should avoid concentrated exposure to extreme cold, extreme heat, vibration, humidity, wetness, and then pulmonary irritation, such as fumes, odors, dust, gases, poor ventilation. The individual should void exposure to unprotected heights and hazardous machinery and should avoid commercial driving.  Would that individual be able to perform the claimant's past work, either as he performed it or per the DOT?

(ECF No.7, PageID #: 86). Based on this hypothetical question from the ALJ, the vocational expert testified that Claimant could not perform his past relevant work, either as he performed it or as it is performed per the DOT. (*Id.*). The vocational expert testified that Claimant's past relevant work left him with skills in sales, contract writing, recordkeeping, price and equipment quotes, credit checks, and customer service. (*Id.*). Based on these skills and the hypothetical given by the ALJ, the vocational expert determined that a person with those limitations and skills would be able to perform work as a phone solicitor, customer order clerk, and supervisor of order takers. (*Id.* at PageID #: 87). The vocational expert testified that his opinion regarding the hypothetical individual's ability to work despite their right-hand limitations and need for use of a cane was based on his "training and experience" as those particular limitations "are not described in that detail in the DOT or SCO [Selected Characteristics of Occupations]". (*Id.*).

The ALJ also asked additional hypothetical questions that they did not rely on in their decision. (*Id.* at PageID #: 87-89).

The ALJ asked the vocational expert whether there were any conflicts between their testimony and the DOT or the SCO. (*Id.* at PageID #: 91). The vocational expert testified there were no conflicts. (*Id.*). With further prompting from the ALJ, the vocational expert added that they had to supplement the definitions of the jobs, but that there was no direct conflict. (*Id.*).

4

**B.  Relevant Medical Evidence**

The ALJ also summarized Claimant's health records and symptoms:

> In terms of the claimant's alleged obesity, he recorded a body weight of 318 pounds on July 17, 2017 (1F/21), which corresponds to a body mass index in excess of forty-six. In turn, this is consistent with a body weight of 332 pounds, recorded on September 3, 2019 (1F/2), and a body weight of 307 pounds, recorded on May 20, 2021 (27F/4). [. . .] In terms of the claimant's alleged chronic kidney disease/chronic renal failure, stage IV, this diagnosis dates to well before his alleged onset date but appears in this record on January 23, 2020 (2F/3). [. . .]
>
> As measured by creatinine and glomerular filtration rates, the claimant's kidney function has remained generally stable. It did improve during a period when the claimant was losing weight (20F/6). On September 25, 2017, the claimant's creatinine level was 1.97, and his glomerular filtration rate was 42 (10F/37). On September 10, 2019, his creatinine level of 1.9, and his glomerular filtration rate was 37 (2F/23). On May 4, 2021, his creatinine level was 2.2, and his glomerular filtration rate was 32 (18F/39).
>
> Sonographic examination of the kidneys, dated September 1, 2017, reported no abnormalities (10F/18).
>
> Radiographic study of the bilateral knees, dated February 5, 2020, reported mild, medial compartment narrowing (3F/92). [. . .]
>
> The claimant began treatment for "new" knee pain on February 25, 2020 (11F/3). He received a single injection to the left knee, on February 25, 2020 (3F/74).
>
> The provider suggested that the claimant's pain was originating in his hips more so than his knees (11F/3) and referred him for further treatment. To date, the claimant has had no further focused treatment for his knees.
>
> Clinical examinations included in the record have consistently, albeit not universally, reported either mildly adverse, or benign findings, including one dated April 3, 2020, which indicated that the claimant presented with a normal gait for age, normal strength and range of motion of the lower extremities, normal reflexes and no focal neurological deficits (4F/11), or one dated March 2, 2021, which indicated normal motor function and strength globally, standing with ease, with normal stance and stride, and no postural

5

instability (27F/15).

The claimant does not, and discernibly has not (2E/5), (27F/2), followed any chronic course of prescription medications discernibly addressed to this impairment.

In terms of the claimant's alleged avascular necrosis of the bilateral hips, status-post hip replacements, radiographic study of the pelvis, dated February 24, 2020, identified avascular necrosis of the bilateral hips (3F/75). While this finding would be consistent with the claimant's allegations of hip replacement surgeries, the record, when considered as a whole, is not supportive of the contention that the existence of this impairment would be preclusive of all types of work.

The claimant's x-ray was made as the result of a referral made after the claimant sought treatment for "new" knee pain in February 2020 (11F/3) and was redirected to an orthopedic provider for his hips (11F/3).

The claimant underwent hip replacement on the left on May 18, 2020 (6F/10), and on the right, on August 17, 2020 (6F/13). In each case (7F/84), (6F/17), the claimant's surgery was accomplished without complication. In each case, the claimant's recovery was as expected. He was released, on November 18, 2020, to return as needed, or in five years, for surveillance radiographs of his appliances (14F/28).

Radiographic study of the bilateral hips, dated September 10, 2020, indicated bilateral hip replacements, without complication (7F/145).

The claimant met all of his [home-based] physical therapy goals by September 2, 2020 (7F/15) and proceeded to facility-based physical therapy. He attended until November 6, 2020 and did not return. At discharge, he was progressing to treatment goals as expected (14F/31).

Clinical examinations, included in the record have consistently, albeit not universally, reported either mildly adverse, or benign findings, such as one dated April 3, 2020, which indicated a normal gait for age, with normal strength and range of motion in the lower extremities, normal reflexes and no focal neurological deficits (4F/11), or one dated March 2, 2021, which reported normal motor function globally, with normal coordination, standing with ease, normal stance and stride, without postural

6

instability (27F/15). The claimant does not, and discernibly has not (2E/5), (27F/2), followed any chronic course of prescription medications discernibly addressed to this impairment.

In terms of the claimant's alleged degenerative disc disease of the lumbar spine, diagnostic imaging of the lumbar spine, dated June 27, 2019, indicated mild degenerative disc disease of the lower lumbar spine, including a herniation at the L5/S1 joint, "possibly" impinging on the exiting L5 nerve roots (3F/117). While this finding would be consistent with the claimant's allegations of bulging discs, the record, when considered as a whole, is not supportive of the contention that the existence of this impairment would be preclusive of all types of work. Regarding the claimant's diagnostic imaging, note is made that the claimant's treatment provider did not indicate complete agreement with the radiologist's conclusions (3F/28).

Radiographic study of the lumbar spine, dated June 26, 2019, indicated mild degenerative disc disease, without instability, fracture, or disc space collapse (3F/30).

Electrodiagnostic study of the lower extremities was reported, on February 25, 2020, as negative (11F/3).

The claimant underwent epidural steroid injections on July 23, 2019 (3F/14) and January 24, 2020 (7F/137). Each afforded significant improvement (3F/8), (7F/128), and the January 2020 injection has proven to be the last of such interventions.

The claimant progressed well in aquatic physical therapy in July and August 2019, describing a few pain-free days in July (3F/18), and that he was walking better with minimal pain in August (3F/5). He was discharged, having abandoned the therapy, on September 3, 2019 (3F/7).

Clinical examinations included in the record have consistently, albeit not universally, reported either mildly adverse, or benign findings, including one dated June 26, 2019, which indicated intermittent numbness and tingling in the L3-4 dermatomes, with a wide-based gait, but likely subsequent to his body habitus (3F/30), one dated April 30, 2020, which reported a normal gait for age, with normal strength and range of motion of the lower extremities, normal reflexes and no focal neurological deficits (4F/11), or one dated March 2, 2021, which reported normal motor function globally, able to stand with ease, with a normal stance and stride, without postural instability (27F/15).

7

The claimant does not, and discernibly has not (2E/5), (27F/2), followed any chronic course of prescription medications discernibly addressed to this impairment.

In terms of the claimant's alleged cardiac impairment, no diagnosis appears for heart failure, and the claimant follows no course of specialized treatment. Rather, the diagnosis is inferred from echocardiographic examination dated September 1, 2017, which indicated stage II diastolic dysfunction, mild-to-moderate valvular regurgitation, and moderate, concentric left ventricular hypertrophy, but in a setting with a left ventricular ejection fraction of 60% (2F/21-22).

Hyperlipidemia and hypertension were diagnosed in October 2020 (17F/15), but have been apparent on blood chemistry testing (2F/8), (3F/84) since before the alleged onset date for this claim. Atherosclerotic disease was noted on x-ray of the knees (3F/92), and sonographic examination of the carotid arteries noted stenosis of between 40 and 59% (17F/77). However, the record, when considered as a whole, confirms the impression that the existence of this impairment would not be preclusive of all types of work.

The claimant has followed various, multi-agent prescription regimens in order to control his hypertension, a significant concern of his nephrologist (2E/5), (27F/2), but has yet to achieve more than episodic, reasonable control (5F/3).

He does not (27F/2), and discernibly has not (2E/5), (5E/6), followed any course of chronic medications intended to address either hyperlipidemia, or heart failure in any direct fashion. Echocardiographic examination dated October 24, 2020, indicated moderate left ventricular hypertrophy, with moderate dilation of the right ventricle, moderate aortic valve regurgitation, and trace-mild regurgitation of the mitral, tricuspid, and pulmonic valve, and indeterminate diastolic function, but also with normal wall motion, normal left and right ventricle function, with a left ventricular ejection fraction of 65% (17F/54). Notably, the independent medical expert characterized this study as normal (24F/9).

Clinical examinations included in the record have consistently, albeit not universally, reported either mildly adverse, or benign findings, including one dated January 17, 2019, which indicated trace-to-one-plus pitting edema, a regular rate and rhythm, with lungs clear to auscultation and percussion (3F/51), or one dated April 22, 2021, which indicated one-plus pitting edema in the

lower extremities, with normal heart sounds, a regular cardiac rate and rhythm, no murmur or bruits (20F/2).

In terms of the claimant's alleged left arm fracture, status-post open reduction, internal fixation surgery, the claimant fell in his brother's garage on June 16, 2018, fracturing his left arm, and underwent surgery on June 19, 2018 (8F/1). However, the record, when considered as a whole, confirms the impression that the existence of this impairment would not be preclusive of all types of work.

Radiographic study of the left arm and wrist, dated July 12, 2018, indicated surgical hardware intact and in adequate alignment, with visible callus formation across the fracture site (8F/88). On August 28, 2018, the claimant was released to return to all activities, without limitations (8F/99).

He continued, for a total of thirty-five visits, in occupational therapy until October 2018, at which time he was discharged to a home exercise program (8F/82).

Clinical examinations included in the record have consistently, albeit not universally, reported either mildly adverse, or benign findings, including one dated April 3, 2020, which indicated normal strength and range of motion of the upper extremities, with no focal neurological deficits (4F/11), or one dated March 2, 2021, which indicated normal motor function globally, and no deficits of coordination (27F/15).

The claimant does not, and discernibly has not (2E/5), (27F/2), followed any chronic course of prescription medications discernibly addressed to this impairment.

In terms of the claimant's alleged degenerative joint disease of the right shoulder, radiographic study of the right shoulder, dated September 10, 2020, indicated mild-to-moderate degenerative changes of the acromioclavicular joint, but no other acute findings (7F/145). While this finding would be consistent with the claimant's allegations of shoulder pain, the record, when considered as a whole, is not supportive of the contention that the existence of this impairment would be preclusive of all types of work.

The claimant has had no further focused treatment for this impairment, whether conservative in nature, as by a course of physical therapy, or more invasive, as by a course of formal pain

management.

Clinical examinations included in the record have consistently, albeit not universally, reported either mildly adverse, or benign findings, including one dated April 3, 2020, which indicated normal strength and range of motion of the upper extremities, with no focal neurological deficits (4F/11), or one dated March 2, 2021, which indicated normal motor function globally, and no deficits of coordination (27F/15).

The claimant does not, and discernibly has not (2E/5), (27F/2), followed any chronic course of prescription medications discernibly addressed to this impairment.

In terms of the claimant's alleged Wilson's disease/status-post liver transplant, the claimant's past surgical history includes a remote [2014] liver transplant, and his past medical history is significant for Wilson's disease, likewise identified in 2014 (1F/20), (5F/1). Serum copper levels were mildly elevated in an April 2021 assay (27F/16), the only immediately identifiable testing that has occurred during the period strictly relevant to this claim [see (9F/57) for historical testing]. However, the record, when considered as a whole, confirms the impression that the existence of this impairment would not be preclusive of all types of work.

Throughout the period relevant to this claim, the claimant's liver function has remained stable, and the plan of treatment remains restricted to use of anti-rejection medications (3F/51), (18F/12). He remains on an annual "return for consultation" schedule (18F/15), an indicator of a medical condition under good control.

As measured by liver enzymes, albumin levels and bilirubin levels, blood chemistry panels in the record have consistently reported findings within normal ranges, as on February 13, 2020 (3F/81) and May 4, 2021 (18F/37).

In terms of the claimant's alleged diabetes mellitus, he was diagnosed with diabetes on May 14, 2020 (6F/7). [. . .]

The claimant was briefly on "Januvia" (2E/5), (5E/6), but is no longer following any course of treatment (27F/2).

Despite this, his hemoglobin A1c levels have remained within normal ranges, registering at 4.6% on August 14, 2020 (6F/10) and 5.6% on April 28, 2021 (19F/18).

10

There are no known complications or co-morbidities involved with the claimant's diabetes (6F/7).

In terms of the claimant's alleged obstructive sleep apnea, this diagnosis was known at least as remotely as December 2014 (6F/5). The claimant has remained on positive airway pressure therapy without difficulties through the period relevant to this claim (3F/50), (6F/46). Titration study, dated June 7, 2021, confirmed the benefits of a change to bi-phasic positive airway pressure, an assessment with which the claimant agreed (27F/3, 7).

(ECF No. 7, PageID #: 49-54).

## IV.    The ALJ's Decision

The ALJ made the following findings relevant to this appeal:

3. The claimant has the following severe impairments: obesity, diabetes mellitus, status post liver transplant, chronic kidney disease/renal failure-stage four, avascular necrosis bilateral hips, status-post arthroplasties, osteoarthritis of the bilateral knees, atherosclerotic disease/hypertension/hyperlipidemia/heart failure [hereinafter, collectively, the "cardiac impairment"], degenerative disc disease of the lumbar spine, status-post left arm fracture and open reduction-internal fixation surgery, degenerative joint disease of the right shoulder, obstructive sleep apnea, and Wilson's disease (20 CFR 404.1520(c)).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except that the claimant must be afforded use of a cane for periods of ambulation; the claimant may occasionally balance, stoop, kneel, crouch, crawl, climb ramps and stairs, but may never climb ladders, ropes or scaffolds; the claimant may frequently reach, and operate hand controls with the right upper extremity; the claimant may occasionally push and/or pull, including the operation of foot controls, with the bilateral lower extremities; the claimant must avoid concentrated exposure to extreme cold, heat, vibration, humidity, wetness, dust, odors, gases, fumes, and other pulmonary irritants, and must avoid all exposure to unprotected heights, hazardous machinery and commercial driving.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on March 2, 1971 and was 46 years old, which is defined as a younger individual age 45-49, on the alleged disability onset date. The claimant subsequently changed age category to closely approaching advanced age (20 CFR 404.1563).

9. The claimant has acquired work skills from past relevant work (20 CFR 404.1568).

10. Considering the claimant's age, education, work experience, and residual functional capacity, the claimant has acquired work skills from past relevant work that are transferable to other occupations with jobs existing in significant numbers in the national economy (20 CFR 404.1569, 404.1569a and 404.1568(d)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from September 28, 2017, through the date of this decision (20 CFR 404.1520(g)).

## V. Law & Analysis

### A.  Standard of Review

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial

evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

### B. Standard for Disability

The Social Security regulations outline a five-step process that the ALJ must use in determining whether a claimant is entitled to supplemental-security income or disability-insurance benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of her residual functional capacity ("RFC"); and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)–(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642–43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that she is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at step five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.*

### C. Discussion

#### 1. Substantial Evidence Supports the ALJ's Consideration of Claimant's Subjective Complaints.

In his first issue, Claimant asserts that "[t]he ALJ committed harmful error when [they] failed to properly apply the criteria of Social Security Ruling 16-3p and failed to find that the intensity, persistence and limiting effects of Laliberte's symptoms, including pain, precluded him

from engaging in substantial gainful activity on a full-time and sustained basis." (ECF No. 9 at 10). In support of this assertion, Claimant cites several subjective complaints testified to during his hearings: that he suffered from shakes, short train of thought, and an "energy problem" as side effects from his mediation (ECF No. 9 at 11); that he was limited to using a computer for thirty minutes (*id*.); that he was "foggy" and felt like his memory "was shot" (*id*.); that he used a cane outside his home (*id*.); that he had "horrible memory problems" (*id*. at 12); that he needed to use the bathroom two to three times per hour (*id*.); that his feet were swollen from blood pressure (*id*.); that he needed to elevate his legs at heart height three to four times a day (*id*.). Claimant argues that the ALJ failed to consider the combination of his symptoms and how they "limited his ability to function and complete his activities of daily living and precluded him from engaging in substantial gainful activity on a full-time and sustained basis." (*Id.* at 14). Claimant also alleges that the ALJ "discount[ed] his allegations of disabling pain" and, thus, "failed to include any related limitations in [the] RFC", specifically, how his pain "interfere[d] with his ability to maintain attention and concentration." (ECF No. 9 at 14-15). The Commissioner argues that the ALJ provided a "lengthy and detailed rationale for [their] evaluation" of Claimant's subjective complaints and that the ALJ's finding is supported by substantial evidence.

The evaluation of a claimant's subjective complaints rests with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs*., 823 F.2d 918, 920 (6th Cir. 1987); *Rogers*, 486 F.3d at 248 (noting that "credibility determinations regarding subjective complaints rest with the ALJ"). In evaluating a claimant's symptoms, the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record. 20 C.F.R. § 404.1529(c); SSR 16-3p, 2017 WL 5180304. Beyond medical evidence, SSR 16-3p sets forth seven factors that the ALJ should consider: 1. Claimant's daily

activities; 2. the location, duration, frequency, and intensity of pain or other symptoms; 3. factors

that precipitate and aggravate the symptoms; 4. the type, dosage, effectiveness, and side effects

of any medication an individual takes or has taken to alleviate pain or other symptoms; 5.

treatment, other than medication, an individual receives or has received for relief of pain or other

symptoms; 6. any measures other than treatment an individual uses or has used to relieve pain or

other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or

sleeping on a board); and 7. any other factors concerning an individual's functional limitations

and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c); SSR 16-3p, 2017 WL

5180304. The ALJ need not analyze all seven factors but should show that they considered the

relevant evidence. *See Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio

2005). "[I]f an individual's statements about the intensity, persistence, and limiting effects of

symptoms are inconsistent with the objective medical evidence and the other evidence, we will

determine that the individual's symptoms are less likely to reduce his or her capacities to

perform work-related activities or abilities to function independently, appropriately, and

effectively in an age-appropriate manner." SSR 16-3p, 2017 WL 5180304. The ALJ's "decision

must contain specific reasons for the weight given to the individual's symptoms ... and be clearly

articulated so the individual and any subsequent reviewer can assess how the adjudicator

evaluated the individual's symptoms." SSR 16-3p, 2017 WL 5180304; *see also Felisky v.

Bowen*, 35 F.2d 1027, 1036 (6th Cir. 1994) ("If an ALJ rejects a claimant's testimony as

incredible, he must clearly state his reason for doing so."). While a reviewing court gives

deference to an ALJ's credibility determination, "the ALJ's credibility determination will not be

upheld if it is unsupported by the record or insufficiently explained." *Carr v. Comm'r of Soc.

Sec.*, No. 3:18CV1639, 2019 WL 2465273, at *10 (N.D. Ohio April 24, 2019) (citing *Rogers*,

486 F.3d at 248-49), *report and recommendation adopted by* 2019 WL 3752687 (N.D. Ohio Aug. 8, 2019).

The ALJ summarized their statement of reasons for discounting Claimant's symptom credibility:

> In sum, the evidence would indicate that the symptom limitations relevant to these impairments are not as severe as alleged. If restricted to the performance of sedentary work, where the claimant would be afforded use of a cane for periods of ambulation; where the claimant would occasionally balance, stoop, kneel, crouch, crawl, climb ramps and stairs, but never climb ladders, ropes or scaffolds; where the claimant would frequently reach, and operate hand controls with the right upper extremity; where the claimant would occasionally push and/or pull, including the operation of foot controls, with the bilateral lower extremities; where the claimant would avoid concentrated exposure to extreme cold, heat, vibration, humidity, wetness, dust, odors, gases, fumes, and other pulmonary irritants, and would avoid all exposure to unprotected heights, hazardous machinery and commercial driving, adequate allowance will have been made for these impairments.

(ECF No. 7, PageID #: 54).  Prior to this summation, the ALJ thoroughly discussed Claimant's medical evidence as well as several of the SSR 16-3p factors. (*See* ECF No. 7, PageID #: 49-54). The ALJ explained that "[t]he claimant has [described] work-preclusive limitations derivative of diabetes, the residual effects of a liver transplant, chronic kidney disease, hip replacement surgeries, arthritis of the knees, bulging discs in his lower back, shoulder pain, a left arm fracture, obesity, and obstructive sleep apnea (2A/1), (4A/1)." (*Id.* at PageID #: 49). Thereafter, the ALJ discussed at length Claimant's impairments and symptoms set forth in the medical evidence. (*See* ECF No. 7, PageID #: 49-54). The ALJ detailed Claimant's treatments for his obesity (*id.* at PageID #: 49); chronic kidney disease/chronic renal failure, stage IV, (*id.*); left knee pain beginning in 2020 (*id.* at PageID #: 50); avascular necrosis of the bilateral hips, status-post hip replacements (*id.* at PageID #50-51); degenerative disc disease of the lumbar spine (*id.*

16

at PageID #: 51); cardiac impairment, including his hyperlipidemia and hypertension (*id*. at PageID # 52); edema (*id*.); left arm fracture, status-post open reduction, internal fixation surgery (*id*.); degenerative joint disease of the right shoulder (*id*. at PageID # 53); Wilson's disease/status-post liver transplant (*id*. at PageID #: 53); diabetes mellitus (*id*.); and obstructive sleep apnea (*id*.).

The ALJ discussed Claimant's therapies, physical, occupational, and conservative, and their successes or failures. (*See e.g. id.* at PageID #: 50 (at discharge from physical therapy for hip replacement, Claimant "was progressing to treatment goals as expected."); *id*. at PageID #: 51 (Claimant was discharged from aquatic therapy due to abandoning treatment.); *id*. at PageID #: 52 (discussing Claimant's occupational therapy from his left arm fracture); *id*. at PageID #: 53 (noting Claimant underwent no further treatment for his degenerative disc disease)).

The ALJ also discussed Claimant's daily activities:

> At one point or another in the record (either in forms completed in connection with the application and appeal, in medical reports or records, or in the claimant's testimony), the claimant has reported the following daily activities: the claimant reports the ability to wash dishes and help his wife with many indoor household chores. He is able to drive a car, to read and watch television for [pleasure] [hearing testimony 1]. He walks on a treadmill and rides an exercise bicycle (14F/30). He is said to be independent with laundering clothing and cooking (3F/42), and in one instance reports cooking a lot for his family over a weekend (3F/9). In multiple surveys, reported across the record, he describes himself as independent with all activities of daily living (3F/30), (4F/10), (6F/32), (8F/31). In one instance, he describes attending a convention in Orlando, Florida and walking for ten hours in a single day (3F/41). When he fractured his arm he was visiting with his brother in North Carolina (8F/109). In short, the claimant has described daily activities, which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations. While none of these activities, considered in isolation, would warrant or direct a finding of "not disabled"; when considered in combination, they strongly suggest that the claimant

> would be capable of engaging in the work activity contemplated by
> the residual functional capacity.

(ECF No. 7, Page ID #: 54-55).

The ALJ discussed Claimant's continued prescription treatments – or lack thereof – including conservative courses, medication, complications, and resulting implications on Claimant's impairments. (*See id.* at PageID #: 50-54). (*E.g.. id.* at PageID #: 50 ("The claimant does not, and discernibly has not (2E/5), (27F/2), followed any chronic course of prescription medications discernibly addressed to [his left knee pain]."; *id.* at PageID #: 51 ("The claimant does not, and discernibly has not [ ], followed any chronic course of prescription medications discernibly addressed to [his hip] impairment.") (citing ECF No. 7 at Ex. 2E, p. 5 and 27F, p. 2); *id.* ("The claimant does not, and discernibly has not [ ], followed any chronic course of prescription medications discernibly addressed to [his degenerative disc disease].."); *id.* at PageID #: 52 ("The claimant has followed various, multi-agent prescription regimens in order to control his hypertension, a significant concern of his nephrologist (2E/5), (27F/2), but has yet to achieve more than episodic, reasonable control (5F/3). He does not (27F/2), and discernibly has not (2E/5), (5E/6), followed any course of chronic medications intended to address either hyperlipidemia, or heart failure in any direct fashion.") (citing ECF No. 7 at Exs. 2E, p. 5; 27F, p. 2; 5F, p. 3; and 5E, p. 6); *id.* at PageID #: 54 ("The claimant was briefly on "Januvia" [ ], but is no longer following any course of treatment [ ] [for his diabetes].") (citing ECF No. 7 at Exs. 2E, p. 5; 27F, p. 2; and 5E, p. 6).

After thoroughly reviewing the record evidence the ALJ stated: "that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting

effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (*Id*. at PageID #: 55).

Moreover, the ALJ specifically addressed several of the symptoms Claimant identified in his brief and included limitations from these symptoms in the RFC:

> Clinical examinations have reported mild edema, but with normal cardiac rates and rhythms (3F/51), (20F/2), with normal strength, range of motion, and neurological function (4F/11), (27F15), including coordination (27F/15) and gait (1F/9), (27F/15). The claimant, by his own admission, remains independent with all activities of daily living (3F/30), (8F/51). At times, this has included walking ten hours a day at a convention (3F/41). Still, because of the claimant's persistent edema, his combination of impairments, reports of fatigue [hearing testimony] and residual weakness of the left hand [hearing testimony], restriction to sedentary work appears most appropriate.

(ECF No. 7, PageID #: 55).

Claimant directs the Court to several symptoms that were not specifically discussed by the ALJ's decision: i.e. his need to elevate his legs, frequent need to use the bathroom, and purported memory issues. Claimant cites to no medical records that support his claims regarding the severity of these symptoms. (*See* ECF No. 9). With respect to Claimant's assertion that he needs to elevate his legs to heart level, the medical records he cites do not contain instructions to elevate his legs. (*See* ECF No. 9 at 19 (citing to Tr. 432, 435, 439, 442, 685-86, 1906, 1909)). Moreover, as the Commissioner pointed out, an ALJ is not required to include a limitation for elevating legs in an RFC where "no medical expert opined that [claimant] would need to elevate her feet to waist level during the workday or even every day." *Sorrell v. Comm'r of Soc. Sec*., 656 F. App'x 162, 170 (6th Cir. 2016). Claimant has not referred to any such opinion. During the January 2021 hearing, the ALJ noted that the medical records lacked any reference to Claimant's alleged memory problems. (ECF No. 7, PageID #: 145-46). And although Claimant stated that

19

his primary care physician, Dr. Richard Cooper, was aware of this symptom, the records from Dr. Cooper do not reflect this. (*See id*. at Ex. 13F).

It is inconsequential, however, that the ALJ did not individually address each of Claimant's asserted symptoms because the ALJ stated that they had carefully considered the entire record and "all symptoms" at this step in the process. (*See id*. at PageID #: 48 ("In making this finding, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and SSR 16-3p. The undersigned also considered the medical opinion(s) and prior administrative medical finding(s) in accordance with the requirements of 20 CFR 404.1520c.")). *Emard v. Comm'r of Soc. Sec*., 953 F.3d 844, 851 (6th Cir. 2020) (citing *Gooch v. Secretary of Health & Human Services*, 833 F.2d 589, 591-92 (6th Cir. 1987) (concluding that an ALJ's statement that he had conducted "a thorough review of the medical evidence of record," along with the fact that the ALJ had considered the claimant's impairments individually, sufficed to show that the ALJ had considered the impairments in combination.)). "To require a more elaborate articulation of the ALJ's thought processes would not be reasonable." *Gooch*, 833 F.2d at 592. Accordingly, this argument lacks merit.

Claimant also alleges that the ALJ omitted "all non-exertional functional limitations imposed by [his] physical impairments." (ECF No. 9 at 15). However, the RFC included non-exertional limitations like postural limitations and limitations preventing Claimant from exposure to environmental and safety hazards. *See* 20 C.F.R. § 404.1569a(a) ("Limitations or restrictions which affect your ability to meet the demands of jobs other than the strength demands, that is, demands other than sitting, standing, walking, lifting, carrying, pushing or pulling, are

considered nonexertional."). Specifically, the ALJ stated that "the claimant must avoid concentrated exposure to extreme cold, heat, vibration, humidity, wetness, dust, odors, gases, fumes, and other pulmonary irritants, and must avoid all exposure to unprotected heights, hazardous machinery and commercial driving." (ECF No. 7, PageID #: 48). Claimant does not explain what non-exertional function limitations were omitted by the ALJ. ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997); *Hollon ex rel. Hollon v. Comm'r of Soc. Sec*., 447 F.3d 477, 490–91 (6th Cir. 2006) ("we limit our consideration to the particular points that Hollon appears to raise in her brief on appeal."). Because Claimant fails to adequately raise this issue on appeal and fails to address it in anything other than a perfunctory manner, the Court considers this argument waived.

Overall, the ALJ's decision thoroughly reviewed the medical evidence and several of the SSR 16-3p factors. The ALJ's decision satisfies the Court that the ALJ considered all of the relevant evidence and that a reasonable mind might accept that evidence as adequate to support the ALJ's credibility finding. There exists, therefore, no compelling reason for the Court to disturb that finding. *Cross,* 373 F. Supp. 2d at 732.

**2. Substantial Evidence Supported the ALJ's Reliance on Vocational Expert Testimony.**

In his second issue for review, Claimant asserts that "[t]he ALJ committed harmful error when at Steps Four and Five of the Sequential Evaluation [they] found that Laliberte had transferable work skills which precluded a finding of disability." (ECF No. 9 at 16).[1]

At step five the Commissioner has the burden of proof to show "that there is work available in the economy that the claimant can perform." *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999). "The step five analysis is meant to determine, given the severity of the impairments *already proven*, whether there are jobs in the economy which a claimant can perform." *Id.* (emphasis added). If a Claimant has not established limitations to be included in an RFC by step four, the burden does not shift to the Commissioner to prove an RFC – or its limitations – at step five.  *Id.* at 392.

To meet this burden, the Commissioner must make a finding "supported by substantial evidence that [the claimant] has the vocational qualifications to perform specific jobs." *Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (internal quotation marks and citation omitted). "This substantial evidence may be in the form of vocational expert testimony in response to a hypothetical question, but only if the question accurately portrays [the claimant's] individual physical and mental impairments." *Baker v. Barnhart*, 182 F. App'x 497, 500 (6th Cir. 2006) (citations and internal quotation marks omitted). "On occasion, a [vocational expert's] testimony conflicts with the information set forth in the DOT." *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 603 (6th Cir. 2009). "In an effort to insure that such actual or apparent conflicts are addressed, the Social Security Administration has imposed an affirmative duty on

---

[1] Although Claimant states the ALJ erred at Step Four, he provides no further analysis of this assertion. Instead, Claimant acknowledges that the ALJ's Step Four conclusion that he is unable to perform any past relevant work is correct. (*See* ECF No. 9 at 17 ("In this matter, the ALJ correctly determined that Laliberte was unable to perform any of his past relevant work (Tr. 29).")).

ALJs to ask the [vocational expert] if the evidence that he or she has provided 'conflicts with [the] information provided in the DOT.'" *Id.* (quoting S.S.R. 00–4p, 2000 WL 1898704, at *4). "ALJs must also 'obtain a reasonable explanation for ... apparent conflict[s]' if the [vocational expert]'s evidence 'appears to conflict with the DOT.'" *Id.*

Claimant argues that the vocational expert's testimony conflicted with the evidence in the DOT regarding his transferrable skills. (ECF No. 9 at 17-18 (Citing Social Security Ruling 00-4p, 2000 WL 1898704 (S.S.A.) (ALJ must obtain an explanation for "apparent unresolved conflict" between a DOT job definition and the vocational expert's testimony)). Claimant, however, does not identify which part of the DOT contains the conflict, nor does he cite any evidence from the DOT that conflicted with the transferrable skills named by the vocational expert. Because Claimant points to no authority or fact in the administrative record indicating a conflict between the vocational expert's testimony and the DOT, this argument is without merit. *Lindsley*, 560 F.3d at 605.

Moreover, the ALJ properly questioned the vocational expert regarding any potential conflict. "Under the SSR 00–4p, the ALJ is entitled to evaluate the testimony of a vocational expert, the DOT, and other relevant evidence, but is not required to rely on any of these sources." *Martin v. Comm'r of Soc. Sec.,* 170 F. App'x 369, 374 (6th Cir. 2006). "Furthermore, even if there is a conflict between the expert's testimony and the DOT, 'neither the DOT or [the expert's testimony] automatically trumps when there is a conflict.'" *Id*. (quoting SSR 00–4p). "When there is a conflict, the ALJ must resolve the conflict by determining if the explanation given by the expert is reasonable and provides a basis for agreeing with the expert rather than the DOT information." *Id.*

Here, consistent with the SSR 00–4p, the ALJ asked if there was a conflict:

Q  Mr. Salkin, is there conflict between your testimony and the DOT or the SCO?

A  No.

Q  But I think you did indicate the areas where you had to rely on

A  Yes, I did supplement, but there's not a direct conflict. That's correct.

Q  Okay.  All right.  And that's because it's not -- why I can't talk this morning -- specifically addressed. Correct?

A  Yes.

(ECF No. 7, PageID #: 91). Claimant was afforded a full opportunity to cross-examine the vocational expert and did not bring out any conflicts with the DOT. "[C]ounsel may not now complain because he failed to cross examine [the expert] when he had an opportunity to do so . . . ." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 837 (6th Cir. 2006); *Baranich v. Barnhart*, 128 F. App'x 481, 490 (6th Cir. 2005) (finding that ALJ committed no error when attorney voluntarily abandoned questioning of vocational expert). The ALJ had no duty under SSR 00–4p to interrogate the vocational expert further. *See Martin*, 170 F. App'x at 374 ("Nothing in [SSR] 00–4p places an affirmative duty on the ALJ to conduct an independent investigation into the testimony of witnesses to determine if they are correct."). Because Claimant did not bring any conflict to the attention of the ALJ, the ALJ did not need to explain how the conflict was resolved. Here, the ALJ specifically asked if there was a conflict and the uncontradicted testimony of the vocational expert indicated that no conflict existed. Accordingly, the argument lacks merit.

Claimant also argues that the ALJ erred by finding that he had transferable skills. For a person closely approaching advanced age, such as Claimant, the medical vocational guidelines would have dictated a finding of disabled unless the person had transferrable skills. *See* 20

24

C.F.R. Pt. 404, Subpt. P, App. 2, Rule 201.14, 201.15. An ALJ may use "the services of a [vocational expert] to help determine whether a claimant's work skills can be used in other work, and, if so, the specific occupations in which they can be used." *Kyle v. Comm'r of Soc. Sec*., 609 F.3d 847, 855 (6th Cir. 2010) (citing 20 C.F.R. § 404.1566(e); *Beinlich,* 345 Fed.Appx. at 168). Here, the vocational expert testified that Claimant's skills, namely – sales skills, contract writing skills, recordkeeping skills, price and equipment quotes, credit checks, and customer service – were transferable to the jobs as a telemarketer, customer order clerk, and supervisor of order takers. (ECF No. 7, PageID #: 86-91). Ultimately, the ALJ accepted the vocational expert's testimony and found that Claimant could perform those same jobs with the limitations provided in his RFC.

Claimant has not explained how the ALJ's conclusion is contrary to law or facts in the record. Instead, Claimant appears to take issue with the ALJ relying on a hypothetical that did not include additional limitations that he believes should have been in the RFC. (*See* ECF No. 9 at 18) ("The ALJ erred when she failed to incorporate any of these documented limitations in her RFC."). Claimant argues that the ALJ should have adopted limitations regarding "sitting for only 4 hours a day," his need to "sit for 4 hours and stand/walk for 2 hours each", his need to elevate his legs, his need to use the bathroom once an hour, and his memory problems that "would interfere with the ability to perform semi-skilled or skilled work." (*Id.* at 18). In support of these limitations, Claimant relies on his argument in Issue 1 that the ALJ erred in their credibility determination. (*See id.*). However, as explained above, the medical record does not support the severity of symptoms complained of by Claimant and substantial evidence supports the ALJ's credibility determination. Here, the ALJ adopted the limitations of the hypothetical that they found properly included Claimant's limitations that were supported by the record. Although the

ALJ – and counsel – raised with the vocational expert additional hypotheticals with additional limitations, the ALJ concluded that these limitations did not apply to Claimant. As detailed above, this decision was supported by substantial evidence and within the ALJ's "zone of choice".

Accordingly, because the vocational expert determined that the Claimant had transferable work skills that could be completed with the limitations properly included in the RFC, sufficient evidence supports the ALJ's finding that work is available in the economy that Claimant can perform. *Baker*, 182 F. App'x at 500.

### VI. Recommendation

Based on the foregoing, it is RECOMMENDED that the Court OVERRULE Claimant's Statement of Errors and AFFIRM the Commissioner's decision.

Dated: September 21, 2023

s/ *Carmen E. Henderson*
CARMEN E. HENDERSON
U.S. MAGISTRATE JUDGE

---

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F. 3d 520, 530-31 (6th Cir. 2019).